**AGNEW et al. v. AMERICAN PRESIDENT LINES, Limited.**

**GRIFFIN et al. v. SAME.**

**FEDERER et al. v. SAME.**

**WHARTON v. SAME.**

Nos. 24445–R, 24506–G, 24549–G, 24519–G.

District Court, N. D. California, S. D.

Aug. 26, 1947.

Albert Michelson, of San Francisco, Cal., for certain libelants.

Gladstein, Anderson, Resner, Sawyer & Edises and Harold M. Sawyer, all of San Francisco, Cal., for certain libelants.

Leonard J. Bloom, of San Francisco, Cal., for certain libelants.

Lillick, Geary, Olson, Adams & Charles and James L. Adams, all of San Francisco, Cal., for respondent.

GOODMAN, District Judge.

In these consolidated actions, libelants, who comprised the greater part of a complement of approximately 172 crew members of the merchant ship President Harrison, seek recovery from respondent shipowner of so-called war risk bonus for the period of their internment on land (December 8, 1941, to August 15, 1945), by the Japanese, during World War II, and during part of their repatriation voyage (i. e. to the 180th meridian) to the United States, at the rates alleged to have been fixed in their shipping articles, as well as for an award for maintenance while interned. Their claims aggregate a sum in excess of $600,000. The United States intervened in certain of the actions for the purpose of protecting a claimed right on its part for reimbursement in the event of any award by the Court in favor of libelants for maintenance.

The facts disclosed at the trial are briefly as follows:

The President Harrison, having opened shipping articles on October 15, 1941, governing a voyage about to be taken, sailed on October 17, 1941, from San Francisco westward for Manila and other trans-Pacific ports. On December 8, 1941, she was overtaken and seized by the Japanese in waters off the Chinese Coast and eventually her crew was interned by the enemy in and about Shanghai. On or about August 15, 1945, the Japanese surrender brought about libelants' liberation from internment. Libelants were then repatriated to the United States. Basic and emergency wages owing them throughout the period of internment to the time of repatriation were paid as well as whatever wages, bonuses and maintenance were still owing them at the time of internment.[1]

When the shipping articles were opened, two riders were affixed thereto by respondent. One rider affected the licensed crew

[1] Payment was at the rates prescribed by the various collective bargaining agreements, basic and supplementary, operative at the commencement of the voyage; except that wherever these agreements had been supplanted by later agreements establishing higher compensation, payment was at that increased rate. Thus, settlement of unpaid war risk bonus with the licensed officers for the period preceding their internment was at the rate fixed by supplementary bonus agreements consummated after the opening of the articles. Bryan's Exhibit 49, 51.)

and is set out in full in Appendix I; the other rider affected the unlicensed crew and is set out in full in Appendix II.

When the articles were opened, there were in effect certain agreements designated "Supplementary Bonus Agreement" which had been executed between the Pacific American Shipowners Association (of which respondent was a member) on the one hand and the various Maritime Unions representing libelants, on the other hand. These supplementary bonus agreements implemented, with respect to bonuses and internment benefits, the several basic collective bargaining agreements between the same parties. These basic collective bargaining agreements are the agreements mentioned and referred to in the riders. The pertinent provisions of the supplementary bonus agreements affecting unlicensed personnel are set out in Appendix III. The pertinent provisions of the supplementary bonus agreements affecting licensed personnel are set out in Appendix IV.

At the trial the parties agreed that the term "emergency wage increase" contained in the riders is meant to be synonymous with "war bonus."

The main question presented is whether the libelants are entitled to war bonus and maintenance during the period of their internment on land by the Japanese.

The rights of the parties with respect to war bonus rest in contract. Libelants contend that the only contract between the parties is the shipping articles with attached riders, and that by the terms of the riders, the liability of the respondent for war bonus during the land internment is established. They further urge that even if the provisions of the riders be ambiguous or uncertain, recourse to the supplementary bonus collective bargaining agreements cannot be made to resolve the same. In furtherance of this contention, libelants strenuously objected to the introduction in evidence of the last mentioned agreements, and in the briefs filed on submission of the case, argue against their admissibility. The principal objection urged against the admissibility of these agreements is that the riders clearly provide for war bonus during land internment; but that if there be any ambiguity or uncertainty in the riders, the fault is that of respondent who prepared the riders, and that the court, guided by well known and historic admiralty principles, has a duty to resolve such uncertainties or ambiguities in favor of the seamen.

Respondent on the other hand contends that the language of the riders patently demonstrates the non-liability of respondent; but that if there be ambiguity, resort can always be lawfully had to other documents or even to parole for the purpose of showing the true contract of the parties and their real intent.

Thus, libelants and respondent each find in the riders a clearly defined exposition of the rights and obligations relating to the so-called war risk bonus guaranties.

Libelants interpret the articles to establish respondent's liability and respondent, the contrary.

The extreme antithesis of their respective analyses of what they say the riders so clearly define, should, without more, produce in an impartial mind the conviction that the riders are ambiguous and uncertain. The riders provide that war bonus "shall be paid while employees are in the *war zones defined herein.*" But there are no war zones defined therein as such, either geographically or otherwise. Libelants say that the "war zones" are defined in the paragraph in each rider which reads as follows: "This emergency wage increase (i. e. war bonus) to apply from the *crossing* of the 180th meridian westbound until *crossing* the 180th meridian eastbound." There is no other language in the rider which by any stretch of the imagination could supply the missing definition of "war zones." It is contended by the libelants that war zones are, by the language just above quoted, all *areas,* land or sea, west of the 180th meridian; but respondent says, with at least equal plausibility, that the language quoted must be viewed as no more than a guaranty of war bonus benefits on that part of the vessel's *voyage* carrying it west of the 180th meridian. Indeed, the argument that the language of paragraph

4 of Appendix I and paragraph 6 of Appendix II demonstrates a contractual intent to pay *wages during internment* and *war bonus during the voyage* west of the 180th meridian and back, is quite persuasive.

▪ Analysis of these antithetical view points could proceed further but what has already been said demonstrates the ineffectuality of justly eliciting from the terms of the riders alone, a single undeniable intent of the parties in connection with war bonus coverage. Upon that basis alone, resort to the supplementary bonus collective bargaining agreements to determine the real intent of the parties is justified and indeed is necessary in order to accomplish justice. This, the most bitter adversaries must be willing to admit, is the primary objective of the judicial process.

But libelants contend that even if there be ambiguity in the provisions of the riders, it must be resolved in their favor without recourse to such explanatory evidence as is contained in the supplementary agreements—first, because the Congress has provided that the shipping articles "shall be deemed to contain all the conditions of contract with the crew as to their service, pay, voyage, and all other things * * *," 46 U.S.C.A. § 676; secondly, because the riders were prepared by and must be construed most strongly against respondent; and thirdly, that the riders' provisions must be interpreted liberally in favor of the seamen in line with the traditional solicitude of the courts of admiralty for their physical and economic well being. Garrett v. Moore-McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239. Such arguments might well convince if the court were compelled to consider the riders on their face and without benefit of any circumstantial aid in resolving the inherent ambiguity in their terms. The arguments also would have merit if, after considering all of the relevant documents and facts in evidence, uncertainty nevertheless remained. In reality, however, the substance of libelants' argument is that the court is bound to blindfold its judicial eye to any relevant matters which might clear up a patent ambiguity to the seamens' disadvantage, merely because of the liberal doctrines which have been applied in dealings between shipowner and seamen for the latter's protection. But to deny a litigant the right to explain actual mutual intent in the use of ambiguous or uncertain terms, solely to preserve such ambiguity or uncertainty for the legal advantage to be thereby derived to his adversary, is beyond the bounds of all judicial liberality.

Furthermore, such a theory violates the spirit of fairness which must dominate the practical application of abstract legal concepts in a judicial system bent upon an impartial administration of law.

▪ Section 676 of Title 46 U.S.C.A. does no more than reaffirm the familiar parol evidence rule that the plain terms of a contract may not be changed by recourse to extrinsic evidence. Certainly it does not vary the fundamental principle that ambiguity and uncertainty in language may be extrinsically clarified. True it is that the admiralty, in its jealous regard for the protection of the contractual rights of the lesser privileged seaman, requires shipping articles to make clear the essential terms of the contract of hire. Rules of admiralty law of this nature spring from the days when the seaman stood alone and when his need for legal protection in arriving at a fair contract of hire was very great. Consequently, in the national interest as well as in the seaman's own private interest, exceptional legal safeguards have protected the seaman against encroachment upon his human rights at the hands of the more favorably situated shipowning employer. However, the legal protection so established arose from and was based upon need. In good reason, the legal right thereto should be commensurate with and limited to such need. Today in the employer-employee relationship the position of the workman, and seaman as well, has become more fully equalized by force of his legally guaranteed right of collective bargaining.

When the President Harrison articles were opened, supplementary bonus agreements, collectively arrived at, were effective. They were binding upon libelants as

well as respondent and resulted from negotiations in which the seamen were adequately represented and their rights vigorously safeguarded. Their terms cannot be ignored or rejected, merely because of the possibility that they might, in a manner adverse to libelants, supply the explanation to uncertain language in the articles.

Decision in this case might well rest upon an interpretation of the riders themselves to the effect that "war zones" in the riders referred to and characterized only the designated areas as and when traversed by the President Harrison. But the court is of the view that justice requires consideration of the full picture of the contractual relations of the parties. Consequently I hold that the supplementary bonus agreements are properly in evidence, as part of the contract of hire governing the voyage of the President Harrison, to explain the uncertainties in the riders' terms.

The supplementary agreements do not provide for war bonuses during the crew's internment on land. So much has been decided in this Circuit in Steeves v. American Mail Line, 9 Cir., 154 F.2d 24. There the court construed two of the same supplementary agreements here involved (Resp.Ex.A, Bryan Ex. 48, 50), and held that the bonus areas therein designated pertained only to the sea and to voyages thereon. Nevertheless, recovery of war bonus in that case was allowed, because the riders to the shipping articles specifically provided for the payment of the bonus to the crew, if they were interned due to war causes, for the period of their internment and until their arrival back in the United States. The Court held this specific provision of the riders to be controlling as against the claim that the supplementary agreements applied. In the latter, the zones were defined in terms of voyages, and, as to Trans-Pacific voyages, were limited to that portion of the voyage occurring west of the 180th meridian. Land was not included within the war zone area therein encompassed. Steeves v. American Mail Line, Ltd., supra.

Background evidence of the negotiations, proposals and counterproposals leading up to the execution of the supplementary bonus agreements make it further apparent that the war bonus provisions of the agreements were not intended to cover periods of internment on land, but were related entirely to exposure to marine risks.

Detailed consideration of this evidence is unnecessary in view of the language of the agreements and the holding in Steeves v. American Mail Line Ltd. supra.

Steeves v. American Mail Line Ltd. differs from this case in a respect which serves to emphasize the validity of our conclusion. In Steeves' case, the Court decided, as between the riders and the supplementary agreements, which documents measured the rights of the parties. It decided in favor of the riders, because of the specificity of its applicable provisions i. e. the shipowner's unequivocal obligation to pay war bonus during internment of the crew. No ambiguity required clarification. Steeves' case, 9 Cir., 154 F.2d 24, at page 25.

Here, however, there is ambiguity. I have no power to make a new contract for the parties. I can only determine what they meant by the contract they did make. Because the seamen in Steeves' case made a more advantageous contract than the seamen of the President Harrison does not justify this court, under any cloak of admiralty liberality, to both make and enforce a better contract for the crew of the President Harrison. There is here no evidence to support even an inference that the riders were actually intended to enlarge the scope of the war bonus guaranties contained in the applicable supplementary bonus agreements. At best, the language of the riders indicates in inartful attempt to incorporate the bonus provisions of the supplementary agreements into the articles. As a result, the so-called war zones were so incompletely defined as to create the ambiguity which in turn requires resort to the supplementary agreements for clarification.

### Repatriation Bonus.

Respondent admits its obligation under the riders, as yet undischarged, to pay libelants war bonus following libera-

tion and during their repatriation voyage; not however, in the amount fixed by the riders, but rather in a lesser amount as prescribed in the decisions (2c and 2d) of the Maritime War Emergency Board (created at the outbreak of World War II by voluntary agreement between shipowners and maritime unions) effective during the period of libelants' repatriation to the United States. The same contention—that the decisions of that Board superseded conflicting provisions of contemporaneously effective ship articles—was rejected in Steeves. There is no more reason to accept it here. It may be, as respondent claims, that additional facts are here in evidence which were not before the Circuit Court when it reached its decision on this issue. Thus, it appears here that although the Board was created on December 18, 1941, to settle *differences* arising between steamship operators and maritime unions, it operated thereafter to fix, increase, decrease and adjust bonus payments and to prescribe and change bonus areas in line with fluctuating war conditions—all without regard to any existing dispute and sometimes in express repudiation of terms contained in articles and collective bargaining agreements. It also appears that its decisions, so made, were generally accepted by both labor and management. But the holding of Steeves' case also rested upon the proposition, which applies here with equal force, that the evidence did not show that membership of libelants in any of the maritime unions "authorized their unions to submit the question of the interpretation of any of their private contracts with shipowners to the decision of the Emergency Board." Steeves' case, 9 Cir., 154 F.2d 24, at page 26.

There is, in addition, reason for serious doubt whether after commencement of a voyage under shipping articles executed pursuant to law by master and crew, the articles can ever thereafter be modified, in manner detrimental to the seamen's interest, by the collective bargaining process, unless the contract of hiring for that particular voyage, by its own terms contemplated that future commitments by way of collective bargaining be considered part thereof and controlling.

■ Respondent stresses the fact that libelants have themselves accepted wages and bonus payments in excess of those authorized by the contract of hiring, pursuant to collective bargaining agreements and decisions of the Maritime War Emergency Board made after the President Harrison voyage commenced. The propriety of such payments as so made, is not at issue here. Certainly the mere acceptance by libelants of such increased compensation does not estop them from relying on the terms of the article's riders as fixing their bonus rights. It is not even evident that libelants were at all aware of the basis used to pay them off, or that such payments were other than perfunctorily made. Further, respondent's counsel stipulated at trial that "there is nothing that results from the manner and amount of payment of the money that was paid to the men that has deprived them of the right to assert this claim in court." (Tr. 82) The claim so referred to is for bonus according to the riders from time of internment to recrossing the 180th meridian eastbound. Finally, the forms of release executed by libelants when they were paid their wages and finally discharged expressly preserved to them all claims they might have for war risk bonus under the terms of the riders. (Respondent's Exhibit I)

■ My conclusion is that libelants are entitled to bonus limited to the period of their repatriation voyage until crossing of the 180th meridian eastbound, at the rates fixed by the articles' riders. Award of double the amount of such unpaid bonus, as requested by libelants pursuant to 46 U.S.C.A. § 596, is, however, not warranted. Respondent's refusal to pay repatriation bonus in the amount fixed by the riders was not arbitrary nor in bad faith. Its claim that such bonus was governed by the decisions of the Maritime War Emergency Board was not a frivolous one. It paid libelants the greater part of the wages and bonus owing them at the time of their discharge. Under these circumstances, it should not be penalized for being in error in disputing libelants' claim. Glandzis v. Callinicos, 2 Cir., 140 F.2d 111, 114; McCrea v. United States, 294 U.S 23, 55 S.Ct. 291, 79 L.Ed. 735.

Claim for Maintenance.

Libelants claim maintenance for the entire period for which wages were, by the articles, payable to them. The greater part of this period occurred after the voyage terminated, and while they were interned. Absent any stipulation in the articles, all liability of respondent to libelants for wages or maintenance would have ended with the cessation of the voyage. Alaska S. S. Co. v. United States, 290 U.S. 256, 54 S.Ct. 159, 78 L.Ed. 302. When a voyage has been frustrated, shipping articles are at an end. The Edna, D.C., 291 F. 379. The obligation to care for the seaman thereafter is placed by statute upon the United States. 46 U.S.C.A. § 593. Here, respondent engaged in the articles to pay wages only, as fixed by collective bargaining, beyond the termination of the voyage. Libelants construe this commitment as an implied agreement to also pay their maintenance after the voyage's end, because of the admiralty principle that maintenance is an obligation of the shipowner implicit in its contract for the payment of the seaman's wages. The latter principle has to do, however, with a living voyage. (Foster v. Sampson, 9 Fed.Cas.No.4,982; The John L. Dimmick, 13 Fed.Cas.No.7,355.) Respondent's contractual assumption of an obligation from which it would otherwise be legally exempt, to continue wage payments upon the voyage's end, cannot be legally enlarged by implication to include stipulations not expressly entered into by it or which cannot reasonably be regarded as having been intended by those actually made. And reason does not impel the legal conclusion that an agreement to pay wages after a voyage's end is anything more than an agreement to pay the wages so specified.

The provision in the agreement with the Marine Cooks & Stewards Association, which libelants claim constitutes an express promise to pay maintenance after the voyage's end,[2] does not purport so to do, but is clearly referable only to port calls incidental to an active voyage. Libelants' claim to maintenance is therefore not sustained. Consequently the government's intervening applications are moot.

The status of William Levy, barber, is in issue. Although his wages were nominal, he was named as a seaman in the shipping articles and the respondent has offered no good reason to regard him otherwise.

An interlocutory decree may enter, upon findings to be prepared, in accordance with the views herein expressed.

Appendix I. (Licensed Crew.)

Rider for Passenger & Freight Vessels in the Trans-Pacific & Straits Settlements Service.

1. The American President Lines agrees to pay an emergency wage increase of 60% of their basic wages to the licensed crew of the SS *President Harrison*, Voyage *55*.

2. The monthly basic wages as shown in the following agreements between the Pacific American Shipowners Association and the Unions are to be used as the basis for payment of this increase.

| | |
|---|---|
| Master, Mates and Pilots | Effective December 30, 1939 |
| Marine Engineers Beneficial Assn. | " May 1, 1940 |
| American Communication Association | " July 13, 1940, and as amended by arbitration award of May 3, 1941. |

[2] Working Rules applicable on ships generally Sec. 7. When in port and subsistence is not furnished, members of the Steward's Department shall receive seventy-five cents (75¢) per meal and when quarters are not furnished, one dollar and fifty cents ($1.50) per day for room.

Agreement between Marine Cooks and Stewards Association of the Pacific Coast and Steamship Companies in the Intercoastal and Offshore Trade and the Alaska Lines, dated July 5, 1940. (Libelants' Exhibit 6A, Bryan's Exhibit No. 4.)

3. This emergency wage increase to apply from the crossing of the 180th meridian westbound until crossing the 180th meridian eastbound.

4. In the event the vessel is interned, destroyed or abandoned as a result of war operations and is unable to continue her voyage, basic wages and emergency wages specified in the collective bargaining agreement between the Pacific American Shipowners Association and the Unions shown above shall be paid to the date the members of the crew arrive in a Continental United States port, and the employees shall be repatriated to a Continental United States port. War bonuses at the rates specified in paragraph 1, hereof, shall be paid while employees are in the war zones defined herein.

5. In the event of loss of personal effects by any member of the Licensed Crew, due to necessity of abandoning ship resulting from torpedoing, mining or bombing of the vessel, the Company agrees to reimburse each licensed man so affected by an amount not in excess of $500.00.

6. War risk insurance in the sum of $5,000 shall be furnished to licensed members of the crew on this voyage in accordance with agreements.

American President Lines, Ltd.
R. A. Frediani
Deputy U. S. Shipping Commissioner.

Appendix II. (Unlicensed Crew.)

Rider for Passenger & Freight Vessels in the Trans-Pacific & Straits Settlements Service

1. The American President Lines agree to pay an emergency wage increase to the unlicensed crew of the SS *President Harrison*, Voyage 55.

2. The monthly basic wages as shown in the following agreements between the Pacific American Shipowners Association and the Unions are to be used as the basis for payment of this increase:

3. To all employees entitled to receive basic wages of $120.00 per month or less under said agreement, the sum of $80.00 per month.

4. To all employees entitled to receive in excess of $120.00 per month under said agreement, 66–⅔% of such basic monthly wage.

5. This emergency wage increase to apply from the crossing of the 180th meridian westbound until crossing the 180th meridian eastbound.

6. In the event the vessel is interned, destroyed or abandoned as a result of war operations and is unable to continue her voyage, basic wages and emergency wages specified in the collective bargaining agreement between the Pacific American Shipowners Association and the Unions shown above shall be paid to the date the members of the crew arrive in a Continental United States port and the employees shall be repatriated to a Continental United States port. War bonuses at the rates specified in paragraphs 3 and 4 hereof shall be paid while employees are in the war zones defined herein.

7. In the event of loss of personal effects by any member of the unlicensed crew, due to necessity of abandoning ship resulting from torpedoing, mining or bombing of the vessel, the Company agrees to reimburse each unlicensed man so affected by an amount not in excess of $150.00.

8. War risk insurance in the sum of $5,000 shall be furnished to members of the crews on this voyage.

American President Lines, Ltd.
R. A. Frediani
Deputy U. S. Shipping Commissioner.

NOTE.—The agreements mentioned in the riders, fixing the basic and emergency wages payable to libelants, are in evidence as libelants' Exhibits 2, 3, 4, 5 & 6A. They are known as the *basic* collective bargaining agreements. All of these,

| | |
|---|---|
| Sailors' Union of the Pacific | Effective October 10, 1939 |
| Pacific Coast Marine Firemen, Oilers, Watertenders and Wipers Association | " October 1, 1941. |
| Marine Cooks and Stewards' Assn. of the Pacific Coast | " July 5, 1940. |

except the agreement with the Marine Firemen, Oilers, Watertenders, and Wipers Assn., were supplanted by later collective bargaining agreements increasing the seamen's wages, effectuated after the vessel sailed and before its capture. These later agreements are in evidence as part of Respondent's Exhibit A, specifically Bryan's Exhibits 55, 57, 58, 59. None of them, however, contained provisions for war risk bonus or for benefits in the event of internment of the vessel.

## Supplementary Bonus Agreement with Unlicensed Personnel

### Appendix III.

1. The following war bonus rules shall govern the parties hereto—

(a) There shall be five war zones; namely:

I. Trans-Atlantic voyages to Spain, Portugal, East, South or West Coasts of Africa, Red Sea, Persian Gulf, India, Iceland and Greenland. (Whole voyage; except that if any vessel continues eastbound to United States ports via India and the Pacific Ocean said bonus rates for such area will continue until the vessel passes the 180th Meridian, eastbound, and thereafter no further bonuses will be payable.)

II. Trans-Atlantic voyages to Russia (Archangel etc.) (Whole voyage)

III. Trans-Pacific voyages to Japan, Philippine Islands, China, Indo-China, East Indies, Malayan Peninsula. (After crossing the 180th Meridian westbound, until recrossing the same Meridian eastbound)

IV. Trans-Pacific voyages to New Zealand or Australia. (From arrival of vessel in Suva or the crossing of the 180th Meridian, westbound, until departure from Suva or crossing the 180th Meridian eastbound)

V. Canada (Atlantic Coast) (While vessel is north of 35 degrees of north latitude when bound to or from a Canadian port)

\*　　\*　　\*　　\*　　\*

3. This agreement shall remain in effect until November 1, 1943.

4. War Risk Insurance in the sum of $5,000 shall be furnished to members of the crews of vessels on voyages provided for in this agreement.

In the event a vessel is interned, destroyed or abandoned as a result of war operations and is unable to continue her voyage, the basic wages and emergency wages specified in the collective bargaining agreement between the parties shall be paid to the date the members of the crew arrive in a Continental United States port and the employees shall be repatriated to a Continental United States port. War bonuses at the rates specified in subdivision (b) of paragraph 1 hereof shall be paid while employees are in the war zones defined herein.

\*　　\*　　\*　　\*　　\*

6. The provisions of this agreement shall be effective on all voyages shipping articles for which were entered on or after August 16, 1941 or upon any voyage to which the provisions herein are made applicable by special agreement or rider attached to shipping articles.

NOTE.—All libelants were members of one of the following Pacific Coast Maritime unions:

(1) National Organization of Masters, Mates and Pilots of America; (2) Marine Engineers' Beneficial Association (Pacific Coast District); (3) Sailors' Union of the Pacific; Pacific Coast Marine Firemen, Oilers, Watertenders and Wipers' Association; (5) Marine Cooks and Stewards' Association of the Pacific Coast.

The unions representing unlicensed personnel were:

Sailors' Union of the Pacific, Pacific Coast Marine Firemen, Oilers, Watertenders and Wipers Association, and Marine Cooks & Stewards' Association of the Pacific Coast.

## Supplementary Bonus Agreement with Licensed Personnel.

### Appendix IV.

(1) This agreement shall become effective on all voyages shipping articles for which were entered into on or after August 16, 1941, and as to all such voyages and all subsequent voyages shall supersede said

agreement of August 16, 1941, and shall continue in full force and effect as to each war risk area described herein until its abolition as may be anticipated upon cessation of hostilities between warring nations as proclaimed by the President of the United States or otherwise;

(2) War risk areas wherein war risk bonuses shall be paid licensed officers are set forth as follows:

Area I Trans-Atlantic voyages to Spain, Portugal, East, South or West Coasts of Africa, Red Sea, Persian Gulf, India, Iceland and Greenland.

Area II Trans-Atlantic voyages to Russia (Archangel, etc.).

Area III Trans-Pacific voyages to Russia (Vladivostok, Petropavlosk).

Area IV Trans-Pacific voyages to Japan, Philippine Islands, China, Indo-China, East Indies, Malayan Peninsula.

Area V Trans-Pacific voyages to New Zealand or Australia.

Area VI Canada (Atlantic Coast).

Subject to terms and conditions following, war bonuses shall be paid in the respective areas as above defined, as follows:

Area I (a) 66⅔% of basic wages for the entire voyage; $100 for Suez or any other port which is subject to regular bombing, plus $5 per day for each day beyond five days that the vessel is in that port; and (b) $45 for each port in the Red Sea and Persian Gulf not covered in Paragraph (a) supra.

Area II 66⅔% of basic wages for the entire voyage, and $75 for each Russian port.

Area III 66⅔% of basic wages after crossing the 180th meridian, westbound, until recrossing the same meridian eastbound, and $75 for each Russian port.

Area IV 66⅔% of basic wages from the crossing of the 180th meridian, westbound, until recrossing the same meridian eastbound.

Area V 66⅔% of basic wages from arrival of vessel in Suva or the crossing of the 180th meridian, westbound, until departure from Suva or crossing the 180th meridian eastbound.

Area VI 25% of basic wages while vessel is north of 35 degrees of north latitude.

On round-the-world voyages, westward, 66⅔% of the basic wages from the crossing of the 180th meridian westbound until arriving in a Continental United States East Coast or Gulf Coast port, or at the Panama Canal. If any vessel referred to in Area I continues eastbound to United States ports via India and the Pacific Ocean said bonus rates for such area will continue until the vessel passes the 180th meridian, eastbound, and thereafter no further bonuses will be payable.

\*　　\*　　\*　　\*　　\*

(4) In the event a vessel is interned, destroyed or abandoned as a result of war operations and is unable to continue her voyage, basic wages and emergency wages specified in the collective bargaining agreement between the parties shall be paid to the date that members of the crew arrive in Continental United States ports and the employees shall be repatriated to a Continental United States port.

While employees are in the war zone areas described herein war bonuses shall also be paid to them at the rate of 66⅔% of the said basic wages in Areas I to V inclusive, and 25% in Area VI.

NOTE.—The unions representing licensed personnel were: National Organization of Masters, Mates and Pilots of America; and Marine Engineers Beneficial Association (Pacific Coast District.)