### MASON et al. v. TEXAS CO.

No. 4360.

United States Court of Appeals
First Circuit.

Jan. 5, 1949.

Raymond B. Meisnere, of Boston, Mass. (Samson Nathanson, of Boston, Mass., on the brief), for appellants.

William T. Ard, of Washington, D. C. (William T. McCarthy, U. S. Atty., and Edward O. Gourdin, Asst. U. S. Atty., both of Boston, Mass., on the brief), for appellee.

Before MAGRUDER, Chief Judge, and GOODRICH (by special assignment), and WOODBURY, Circuit Judges.

MAGRUDER, Chief Judge.

Appellants Ira S. Mason and Willard M. Carroll, licensed deck officers, were members of an independent union, the Texas Tanker Officers Association (hereinafter called the association), and were employed on American flag ocean-going vessels of The Texas Company (hereinafter called the company), the appellee herein. On August 1, 1941, the association, appellants' certified collective bargaining representative, and the company concluded a collective bargaining agreement, and on March 30, 1942, appellants signed the shipping articles of the S. S. Connecticut at Port Arthur, Texas, for a voyage to Capetown, South Africa, and return to this country. The S. S. Connecticut was under time charter to the United States acting through the War Shipping Administration.

The vessel departed from Port Arthur on March 31, 1942, and while en route to Capetown was sunk by enemy action on April 23, 1942. Appellants were captured and held on enemy vessels until September 22, 1942, when they were interned on the Japanese mainland. They remained so interned until liberated by American forces on August 15, 1945. Soon thereafter they were repatriated to the United States, arriving in October, 1945.

Separate accounts were stated for the period subsequent to the sinking, and payments were made to appellants pursuant to the relevant Maritime War Emergency Board decisions (referred to further hereinafter). These payments included war bonuses, in addition to basic wages and emergency wage increases, for the periods during which appellants were on enemy vessels and on vessels repatriating them. However, for the period of internment on land, from September 22, 1942, to August 15, 1945, they received basic wages plus emergency increases, but no war bonuses. To recover war bonuses for the period of internment, appellants brought libels in personam for $10,600 each in the United States District Court for the District of Massachusetts, and they now prosecute this appeal from findings and a decree adverse to them. D.C.Mass.1948, 76 F.Supp. 318, 1948 A.M.C. 665.

Appellants rest their claims upon the provisions of the aforementioned collective bargaining agreement, and for the time being we assume, without deciding, that this agreement is in fact controlling. The pertinent portions of the agreement on the subject of a war bonus are in Article VIII:

"1. Trans-Atlantic:

"On each Trans-Atlantic voyage on which a vessel enters a port east of 30 degrees West Longitude, a war bonus at the rate of Seventy-Five percent (75%) of his regular monthly wages (exclusive of 'emergency increase') will be paid to each Licensed Officer from and including the day when the vessel departs from the last port in the Western Hemisphere until and including the day the vessel thereafter arrives at a port in the Western Hemisphere; provided, however, that if after proceeding on such voyage from a U. S. port the vessel calls at only one port in the Western Hemisphere before proceeding on the Trans-Atlantic voyage, the bonus will be paid from and including the day the vessel leaves the United States."

"3. General Provisions: * * *.

"(c) In the event of a total loss of the vessel due to hostilities or warlike operations, all licensed officers will be furnished transportation to a United States port and paid their full wages and war bonus until and including the day of arrival at such port.

"(d) Nothing in this Agreement shall prevent changes in this Section by mutual agreement of the Association and the Company."

■ The purport of paragraph 1 is that the bonus provision becomes operative only after the vessel has entered a port east of 30° West Longitude (and then the amount of the bonus is computed retroactively). In the present case the S. S. Connecticut was destroyed before having entered a port so situated. Subparagraph 3(c) makes no mention of the amount of the bonus, and hence we think it clear that a reference back to paragraph 1 must have been intended. We find no indication that the reference back was meant to be limited to the amount of the bonus and was not meant to encompass the condition precedent for qualification for the bonus. Hence, even if we accept the argument that the coverage of subparagraph 3(c) extends to periods of internment, appellants have not met the condition precedent for qualification for the bonus set forth in paragraph 1. This construction reads subparagraph 3(c) as distinguishing between destruction immediately prior to an entry into a port east of 30° West Longitude and destruction immediately after departure from such a port. Just why such a distinction should have been made does not appear, but this is what the parties seem to have provided in the agreement.

■ Although we have proceeded above on the assumption that subparagraph 3(c) was intended to cover periods of internment by an enemy, we are convinced that the contrary is the case. When the collective bargaining agreement was written the United States was not at war, and its seamen were not being interned. The language of the agreement affords little basis for a conclusion that the parties contemplated that the United States would soon become a belligerent or anything more than that the company would fulfill the obligations of subparagraph 3(c) toward captured officers being repatriated in accordance with the usual treatment given seamen of neutral nations.[1] Furthermore, subparagraph 3(c) makes no mention of "intern-

ment", whereas in another case where it was intended that a war bonus should be paid for periods of internment, the parties there involved made specific mention of that fact in a rider to shipping articles signed prior to our entry into the war. Steeves v. American Mail Line, Ltd., 9 Cir., 1946, 154 F.2d 24; cf. Agnew v. American President Lines, Ltd., D.C.N.D. Cal.1947, 73 F.Supp. 944.

■ We have dealt with the case thus far on the supposition that the collective bargaining agreement of August 1, 1941, governs, but we find ourselves in agreement with the district judge's conclusion that the bonus provisions of Article VIII were superseded before the signing of the shipping articles on March 30, 1942. The events upon which this conclusion is based received their impetus from a meeting between representatives of shipping operators and maritime unions shortly after the attack on Pearl Harbor. They agreed to establish the Maritime War Emergency Board to provide voluntary machinery in the maritime industry "for the settlement of disputes without interruption of service or stoppage of work during the period of the war". The Statement of Principles setting up the new Board also stated: "In so far as areas, war bonuses, and insurance are concerned, it is regarded as desirable and necessary that a uniform basis for each item covering the entire nation and the entire industry be reached." It was pointed out that neither the operators nor the unions felt that they would at all times be in a position to "obtain adequate information with regard to the extent of war risks in order to enable them to bargain intelligently". The Statement of Principles was signed for "Independent Unions of Licensed Officers on Tankers" by one John J. Collins, evidently the same man who signed the collective bargaining agreement of August 1, 1941, as J. J. Collins, Advisor. Texas Tanker Officers Association. The

[1] Subparagraph 3(d) of Article VIII indicates that the parties felt they might wish to change the bonus provisions of the agreement. If they considered our involvement in war at all imminent, one of the reasons for inserting this subparagraph was doubtless to provide a means for meeting that contingency by modification of an agreement which in its original form did not do so.

company was not a signatory to the Statement of Principles.

Soon after its inception the Emergency Board began to issue decisions on war risk compensation matters, and on February 27, 1942, Collins, on behalf of the association, wrote to the company asking whether it would abide by the decisions already issued by the Board. Collins stated that the association, as a signer of the Statement of Principles, had agreed to be bound by the Board's decisions. The company replied on March 3, 1942, and stated that by means of the document enclosed "we have signified our willingness to abide by and, in fact, are already abiding by the decisions and clarifications heretofore issued by the Maritime War Emergency Board". The document enclosed by the company was a signed addendum (in duplicate) to the collective bargaining agreement, announcing that Article VIII was stricken and specifying those Emergency Board decisions which were to govern war risk payments. Receipt of the letter and addendum was acknowledged by Collins in a letter dated March 4, 1942: "I will try to see to it that this is signed as soon as possible." Although the addendum was never signed on behalf of the association, on the basis of the above and other evidence we agree with the district judge that it was regarded "only as a convenient written memorandum of a contract or agreement to which the parties considered themselves already bound."

The correspondence between the company and the association may be somewhat unclear as to exactly which Emergency Board decisions the parties had reached agreement on. The only reference to a war bonus in the S. S. Connecticut shipping articles, signed by appellants on March 30, 1942, is in these words: "A War Bonus Payable on this Voyage in Accordance with U. S. Maritime Commission Decisions". The district judge found that the United States Maritime Commission did not issue any decisions relating to war bonuses. Hence, he decided that the quoted provision of the articles, when read in the light of the negotiations between company and association after Pearl Harbor, indicated that the reference was meant to be to Maritime War Emergency Board decisions, and that those Emergency Board decisions issued up to the date of the signing of the articles governed appellants' rights to a war bonus during internment. With this we agree.

We have scrutinized the Emergency Board decisions carefully, and we are convinced, as was the district judge, that they do not provide for the payment of a war bonus for periods of internment on land by the enemy. Decision No. 2 of January 10, 1942, revised on February 24, 1942, is replete with expressions clearly indicating that a bonus was payable only for the time of actual voyage in certain specified waters. The same is true of Decision No. 7, effective March 21, 1942, amended March 30, 1942, which superseded Decision No. 2 and Decision No. 2 Revised. Decision No. 5 of January 23, 1942, revised on February 21, 1942, purports to deal specifically with payments to seamen interned as a result of enemy action. Articles 1 and 2 state that internment payments shall consist of "basic wages and emergency wages", and Article 6 of Decision No. 5 Revised underscores this limitation on payments during internment. In Montoya v. Tide Water Associated Oil Co., D.C.S.D.N.Y., 79 F.Supp. 677, 1948 A.M.C. 1246, the Emergency Board decisions in effect February 24, 1942, were held to preclude the payment of a war bonus while seamen were interned on land.[2]

Since we have found no basis for upholding appellants' claims in the original collective bargaining agreement, in the modification thereof, or in the shipping articles properly construed, cf. Agnew v. American President Lines, Ltd., supra, it is unnecessary to pass on the relative paramountcy of the collective bargaining agreement of August 1, 1941, and the reference to a war bonus in the shipping articles.

The decree of the District Court is affirmed.

[2] Although our conclusion is based on decisions issued up to March 30, 1942, it would have been the same even if we had confined our attention only to those decisions issued prior to one of the conceivably pertinent earlier dates.